Affirmed and Opinion filed May 19,
2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00927-CV



CHRISTUS Health
and CHRISTUS Health Gulf Coast d/b/a CHRISTUS St. Catherine Health &
Wellness Center, Appellants

v.

Rickey
Dorriety, Individually and as Independent Executor of the Estate of Melissa
Dorriety, Deceased and as Next Friend of Timothy Dorriety, an Incapacitated
Person and Patrick Dorriety, Individually, Appellees 



On Appeal from
the 189th District Court

Harris County, Texas

Trial Court
Cause No. 2007-67389



 

OPINION 

            In
this healthcare-liability case, the appellants, Christus Health and Christus
Health Gulf Coast d/b/a Christus St. Catherine Health & Wellness Center
(collectively, (“Christus”), appeal from the trial court’s judgment after a
jury trial.  Christus does not challenge the jury’s finding of negligence, but on
appeal challenges certain damage awards and the apportionment of court costs.  For
the reasons explained below, we affirm.

I

            In
the early 1980s, Melissa Dorriety was diagnosed with the medical condition diabetes
insipidus.  She managed the condition with a drug known as DDVAP.  One day in
June 2006, Mellissa came home from work early, complaining of shortness of breath
and not feeling well.  Her husband, Rickey Dorriety, took her to a local
hospital, Christus St. Catherine in Katy, where she was diagnosed with
hyponatremia, or low sodium, and admitted.  In an effort to raise her sodium
levels, doctors took her off of DDAVP.

            After
two days in the hospital, a doctor ordered that Melissa’s liquid input and
output be strictly monitored because of concerns about her sodium level
fluctuating while she was not taking her diabetes medication.  That afternoon
and evening Melissa’s fluid output began to greatly exceed her input, but no
one notified Melissa’s doctors of this development.  Nor were Melissa’s vital
signs monitored overnight.  A blood test reported to the hospital’s nurses at
6:15 a.m. revealed that Melissa’s sodium was at a dangerously high level.  One
doctor later described the sodium level read at 6:15 a.m. as a “panic value.”  Yet,
no doctor was contacted until 7:50 a.m.  Believing Melissa was to be discharged
that morning, Rickey went to Melissa’s room, where he found her unresponsive.  Melissa
was transferred to the intensive care unit, comatose and already suffering
effects leading to brain damage.  Several days later, Melissa was transferred
to a larger hospital, St. Luke’s, where several specialists examined her, but
they ultimately concluded that there was nothing that could be done to help her
recover from her coma.  Melissa was later discharged to hospice care.  She died
on July 11, 2006.

            The
Dorrietys sued Christus and two of the doctors who treated Melissa, Dr. Mukesh
Mehta and Dr. Lorie Shapiro.  The Dorrietys later nonsuited Dr. Shapiro, and
Christus successfully moved to designate her as a responsible third party.  At
trial, the jury found negligence on the part of Christus and Dr. Shapiro, but
did not find negligence on the part of Dr. Mehta.  The jury apportioned
responsibility at forty percent for Christus and sixty percent for Dr. Shapiro.

            The
jury awarded damages to Melissa’s husband, Rickey, for pecuniary losses in the
past ($75,000) and future ($250,000), but did not award him any damages for
loss of companionship and support in the past or future or for mental anguish
in the past or future.  The jury also awarded damages to Melissa’s adult,
mentally impaired son, Timothy, for pecuniary losses in the past ($75,000) and
future ($1,000,000), but did not award him damages for loss of companionship
and support in the past or future or for mental anguish in the past or future. 
The jury also did not award any damages to Melissa’s other adult son, Patrick,
for pecuniary loss, loss of companionship and support, or mental anguish. 
Finally, the jury awarded damages to Melissa’s estate for medical expenses
($65,536) and funeral and burial expenses ($13,413), but did not award any
damages for physical pain and mental anguish.  The trial court entered judgment
based on these jury findings, awarding the Dorrietys forty percent of the
damages the jury found.

II

A

            In
its first issue, Christus contends the evidence is legally insufficient to
support the jury’s award of medical expenses.  Under a legal-sufficiency
review, we must determine whether the evidence would enable a reasonable and
fair-minded person to reach the finding under review.  City of Keller v.
Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  We credit favorable evidence if
reasonable fact finders could and disregard contrary evidence unless reasonable
fact finders could not.  Id. 

            Christus’s
first argument is framed as a legal-sufficiency challenge to the jury’s finding
of $65,536 in medical expenses paid by Melissa’s estate for her care from her
hospitalization at Christus and two other healthcare entities until her death. 
These expenses were proved by affidavits filed as provided in section 18.001 of
the Civil Practice and Remedies Code and by an agreed summary of past medical
expenses actually paid.  See Tex. Civ. Prac. & Rem. Code § 18.001
(governing affidavits concerning cost and necessity of services).  When a
proper section-18.001 affidavit is filed and no controverting affidavit is filed,
the affidavit “is sufficient evidence to support a finding of fact by [a] judge
or jury that the amount charged was reasonable or that the service was
necessary.”  Id. § 18.001(b).

            The
real thrust of Christus’s argument, however, is that the Dorrietys failed to
present competent expert testimony that linked the medical expenses to the
alleged negligence.  Evidence presented in compliance with section 18.001(b)
does not establish a causal nexus between the accident and the medical
expenses.  Figueroa v. Davis, 318 S.W.3d 53, 61 (Tex. App.—Houston [1st
Dist.] 2010, no pet.).  A plaintiff may recover only for reasonable and
necessary medical expenses specifically shown to result from treatment made
necessary by the negligent acts or omissions of the defendant.  Texarkana
Mem’l Hosp. v. Murdock, 946 S.W.2d 836, 839–40 (Tex. 1997).  

            Christus
complains that the testimony of the Dorrietys’ expert on medical liability, Dr.
Juan Carlos Ayus, was unreliable because he failed to review or segregate the
medical bills and instead relied on the representation of the Dorrietys’
counsel that all of the medical bills submitted were necessary.  Christus
further complains that Dr. Ayus’s testimony misled the jury because it awarded
the full amount of those charges instead of subtracting the amount attributable
to treatment unrelated to any alleged negligence. 

            Dr.
Ayus was not designated to testify as to medical expenses, but was designated
on standard of care, breach of the standard of care, and causation.  The Dorrietys’
counsel provided the medical bills to Dr. Ayus the day before his trial testimony. 
On direct examination, Dr. Ayus testified as follows:

Q:        (Dorrietys’
counsel) You understand once [Melissa] was
transferred to St. Luke’s, there was an admission into St. Luke’s ICU that
lasted for twelve days and then ultimate transfer to hospice? 

A:        (Dr. Ayus) Yes.

 * * *

Q:        It would not surprise you that there were a
variety of consultants called in to take care of Melissa, including a
cardiovascular care providers [sic], Dr. Diaz, who’s a neurologist; Dr.
Velasco, Dr. Suneja, who is a cardiologist.  A radiology group to review CT and
MRI films.  Dr. Salazar.  And then there was actually a hospital ambulance
service that was necessary to transfer her over to St. Luke’s.  None of that
would surprise you at all?

A:        No.

Q:        Okay.  Fair to say, Doctor, that but for the
failures of the hospital, St. Catherine’s, and Dr. Mehta, that none of that
subsequent medical care would have been necessary?

A:        Yes.

Q:        None of the bills from St. Luke’s, from St.
Catherine ICU, from hospice or any of those consultants would have occurred but
for these health care providers’ failures, true?

A:        True.

Q.        Plaintiff’s Exhibit 11[1] is a table
of the amounts paid to those subsequent providers, true?

A.        Yes.

Q.        Those charges were paid and incurred by Ms.
Melissa Dorriety because of the injury she suffered June 16th overnight?

 * * * 

A.        Yes.

            Christus
contends that on cross-examination, Dr. Ayus admitted that some of the medical
bills were incurred for treatment Melissa would have needed for pre-existing
medical conditions, including hypertension and diabetes insipidus, and that he
did not segregate the charges unrelated to any alleged negligence. 
Specifically, Christus relies on the following emphasized testimony:

Q.        (Christus’s counsel) . . . Ms. – Ms. Dorriety had
high blood pressure?

A.        Yes.

Q.        Was she treated for high blood pressure after
this event?

A.        Yes.  She was – yeah, she would – yes.

Q.        She received blood pressure medication?

A.        Yes.

Q.        The blood pressure medication, though, wasn’t
caused by any alleged negligence in this case, correct?

A.        Yes.

Q.        That would be correct?  Before anything happened
in this case, she was treated for a diabetes insipidus?

A.        Yes.

Q.        After the alleged negligence in this case, she
still required treatment for a diabetes insipidus? 

A.        Yes.

Q.        In other words, treatment for diabetes
insipidus was not caused by the alleged negligence in this case?

A.        No.

             *
* *

Q.        My question to you is: Did you go through those
medical bills and find out what expenses were due to the alleged negligence,
and which ones were part of her standard medical treatment?  Did you make that
separation?

A.        No.

Q.        All right. You’ve not had the opportunity to do
that yet as we sit here today, correct?

A.        Correct.

Q.        So some of those medical expenses if – may or may
not be related to the alleged negligence in this case.  As an expert, you can’t
testify under oath this morning as to which may or may not be related to negligence,
correct?

A.        With information provided to me, no, I can’t.

Christus
further complains that Dr. Ayus admitted he had not examined the medical bills,
and in fact, relied on the representation of the Dorrietys’ counsel regarding
whether they were or were not related to any alleged negligence:

Q.        Have – have
you ever gone back and actually looked at the medical bills in this case
yourself?

A.        No.

Q.        Have you gone
through the medical bills sort of line by line to see what charges are related
to any alleged negligence in this case and what charges are not?

A.        No.

Q.        As we
sit here today, do you know what all those specific charges are for? 

A.        I
was told just to this charge [sic] were incurred after the patient was moved to
the ICU after she was found comatose, but –

Q.        The
Plaintiffs’ attorney told you that?

A.        Yeah,
that's what they told me.

Q.        My question is: Have
you, as an expert, gone through and determined whether, in fact, that’s true?

A.        No.

            Although
Christus does not identify any specific charges it contends were incurred
unrelated to any alleged negligence, Christus asserts that some of the charges
were for items and services incurred before the date of the incident, and some
of the charges incurred after the date of the incident—such as treatment for
diabetes insipidus and hypertension—were unrelated to any alleged negligence. 
Christus complains that the Dorrietys nevertheless requested the total amount
of medical expenses, and the jury awarded that amount.  Christus contends the
Dorrietys presented no evidence linking specific medical charges to any alleged
negligence on the part of Christus, and therefore the testimony regarding the
medical expenses was legally insufficient.  

            Christus’s
causation argument relies primarily on Texarkana Memorial Hospital, Inc. v.
Murdock, a case in which the court held that expert testimony failed to establish
a causal link between all medical expenses and the injuries caused by a
hospital’s negligence.  946 S.W.2d at 841.  Although Christus asserts that the
evidence here is “substantially identical” to the evidence in Murdock,
we conclude that Murdock is distinguishable.

            Murdock
involved a child born with serious congenital defects that no one contended
arose from the hospital’s negligence.  Id. at 837.  In addition to these
conditions, the child took in some meconium while in utero.  Id.  After
delivery, a hospital doctor attempted to suction the meconium from the baby’s
throat, and his negligent performance of that task caused additional
complications.  Id.  The child had multiple hospitalizations over a
fourteen-month period before he eventually died.  Id.  The court held:

[Because] there was more than one condition to be treated,
each produced by an independent cause, and sufficient evidence to indicate that
treatment for more than one condition occurred[,] . . . it was incumbent upon
the plaintiffs to prove which treatments were due to meconium aspiration and its
effects, and the specific costs associated with those treatments sufficient to
support a jury award of $500,000 for medical expenses.

Id.
at 840.

            In
contrast, Christus’s negligence caused Melissa to suffer severe brain damage
that became the focus of her medical care until her death.  There was no
evidence that Melissa sought treatment from Christus for other, unrelated
conditions, as in Murdock.   

            Additionally,
in Murdock, the expert witness testifying about the causal link between
the medical expenses and the defendant’s negligence merely opined that “the
therapeutic maneuvers performed at [the hospital were] necessary to treat
meconium aspiration syndrome suffered by” the infant.  Id. at 838.  As
the court noted, the expert’s testimony and the other evidence supporting a
link to some of the damages caused by the hospital “do not indicate that the
conditions caused by [the hospital] were the only conditions necessitating
treatment at [the hospital] and do not establish that all services rendered
there were for meconium aspiration and its effects.”  Id. at 840.  

            In
contrast, Dr. Ayus’s direct testimony established a causal link between the
injuries Christus caused and all subsequent medical care that Melissa received. 
Unlike the expert in Murdock, who opined that only the “therapeutic maneuvers” were
causally related, Dr. Ayus did not equivocate.  Moreover, there were no
substantial competing health concerns that overshadowed the injuries caused by
Christus’s negligence.  Therefore, Dr. Ayus’s testimony was sufficient to
satisfy the required causal link because it presented the jury with “proof that
establishes a direct causal connection between the damages awarded, the
defendant’s actions, and the injury suffered.”  Id. at 838.  

            The
testimony elicited by Christus on cross-examination did not negate Dr. Ayus’s
earlier testimony and conclusively disprove all medical expenses; at worst it
conflicted with his direct testimony, and
so raised a fact issue for the jury to resolve.  See McGalliard v.
Kuhlmann, 722 S.W.2d 694, 697 (Tex. 1986) (stating that the jury “may
resolve inconsistencies in the testimony of any witness”).  Jurors are the sole
judges of the credibility of witnesses and the weight to give their testimony. 
City of Keller, 168 S.W.3d at 819.  Therefore, when reviewing all of the
evidence in a light favorable to the verdict, courts “assume that jurors
credited testimony favorable to the verdict and disbelieved testimony contrary
to it.”  Id. 

            Dr.
Ayus testified that without the negligence of the hospital, Melissa never would
have been admitted to the Christus St. Catherine ICU, to St. Luke’s ICU, or to
hospice care.  He further testified that he relied on representations made by
counsel for the Dorriety family that all listed charges were for services
rendered after Melissa was transferred to ICU.  Christus raised two questions
about items in the medical records that involved conditions that Melissa had
experienced before her hospitalization:  high blood pressure and diabetes
insipidus.  Christus does not identify any specific charges for the treatments,
and it is unclear from the record what treatments Christus refers to.  Based on
the cross-examination of Dr. Ayus, the jury could have believed that any amount
attributable to high-blood-pressure medication was de minimus and not
worth subtracting from the total medical expenses.  The jury may also have
allowed that Christus’s negligence greatly complicated the treatment of
Melissa’s diabetes insipidus.  Indeed, once Melissa had to be moved to ICU
everything about her treatment needs became more serious, more complicated,
and—presumably—more expensive.  It was reasonable for the jury to conclude that
all the treatment Melissa received after going to the ICU was causally related
to Christus’s negligence.

            On
this record, then, we conclude that there was legally sufficient evidence to
support the jury’s award of medical expenses.  See City of Keller, 168
S.W.3d at 819; see also Owens v. Perez, 158 S.W.3d 96, 110 (Tex.
App.—Corpus Christi 2005, no pet.) (concluding jury was entitled to determine
the credibility and weight of evidence developed through cross-examination of
plaintiff’s expert concerning medical expenses). 

B

            In
its second issue, Christus contends the evidence presented regarding custodial
care for Timothy Dorriety was unreliable, irrelevant, and legally insufficient. 
Christus argues the Dorrietys failed to lay a legally sufficient foundation with
their economist, Dr. Richard Bean, to establish the need for custodial care as
well as the type and amount of that care, resulting in an analytical gap
between the information on which Dr. Bean relied and the opinion he offered.  See
Gammill v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex.
1998); Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706, 713 (Tex.
1997).  Christus also contends Dr. Bean based his calculations of the value of
future custodial care for Timothy on incorrect information, which significantly
increased its value, and the jury based its award on this incorrect information. 
See Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238,
255 (Tex. 2008).

            In
the charge, the jury was asked to determine “what sum of money, if paid now in
cash, that would fairly and reasonably compensate Timothy Dorriety for his
damages, if any, resulting from the death of Melissa Dorriety.”  In making this
determination, the jury was asked to consider three categories of damages: 
pecuniary loss, loss of companionship and society, and mental anguish.  The
jury awarded damages only for pecuniary loss, defined in the charge as 

the loss of the care, maintenance, support, services,
advice, counsel, and reasonable contributions of an actual economic value that
Timothy Dorriety, in reasonable probability, would have received from Melissa
Dorriety had she lived.  Do not include in your answer for this element any
loss that does not have an actual economic value.

Thus,
the jury’s award was not merely for custodial care, but encompassed a range of factors
the jury could have considered when determining the economic value of the
Timothy’s loss of his mother.  Nevertheless, Christus contends the only
evidence of pecuniary damages presented at trial as to Timothy was for
custodial care, and that evidence was legally insufficient.

            The
Dorrietys presented Dr. Bean to testify about some of the some of the factors
that may be taken into account when determining pecuniary loss.  Dr. Bean
included lost income from Melissa’s job, the value of standard household
services, and the additional value of the services provided by Melissa in
taking care of her handicapped son, Timothy.  Dr. Bean testified in some detail
about the data upon which he relied:  

            Lost
income: Dr. Bean testified that he reviewed Melissa’s employment records from
Fluor as a starting point, and then relied on U.S. Department of Labor tables,
census data, and employment records, to determine her average work-life
expectancy and wage growth.  More specifically, he used tables that predict
work-life expectancy based on birth date, education level and gender.  Dr. Bean
testified that economists throughout the country regularly rely on these data
and techniques.

            Household
services: Dr. Bean testified that he utilized a survey conducted by the federal
government about average time spent on household services, in which 18,000 households
were called daily and asked to answer an extensive questionnaire.  He testified
that economists routinely combine those tables with Department of Labor
statistics and produce dollar values for household services.  For the remaining
years of Melissa’s work-life expectancy, Dr. Bean used a table applicable to women
working full-time with a child under 13 at home; for the years
after her work-life expectancy he used a table for women not working with a
child under 13 at home.  He testified that these tables provide standard data upon
which economists routinely rely.  

            Care
for Timothy:  Because Timothy is incapable of taking care of himself or
living alone, Dr. Bean calculated the cost of hiring an attendant to be with
him when his parents will be unavailable, and used the hourly rate for an
attendant that Blue Cross/Blue Shield is willing to pay.[2]  He
testified that this is a standard·method used by economists.

            Christus
contends Dr. Bean’s testimony is legally insufficient because he did not
consult with anyone involved in Timothy’s case regarding the amount and type of
care Timothy requires, he did not speak to the Dorrietys regarding the
custodial care provided to Timothy, and his only source of information on the
issue was conversation with the Dorrietys’ counsel.  Christus maintains that because
no reliable expert testimony regarding custodial care for Timothy was
established, there was no legally sufficient foundation establishing the need
for or type and amount of that care, resulting in an “analytical gap” between
the information on which Dr. Bean relied and the opinion he offered.  

            However, Timothy’s
father and brother testified in detail about Timothy's cerebral palsy, his
inability to feed or dress himself, and his other limitations.  On these facts,
the Dorrietys were not required to provide expert testimony to establish that a
person with these limitations requires additional, basic care.  See Morgan
v. Compugraphic Corp., 675 S.W.2d 729, 733 (Tex. 1984) (concluding that lay
testimony may establish causation of damages “in those cases in which general
experience and common sense will enable a layman to determine, with reasonable
probability, the causal relationship between the event and the condition”). 

            Christus
also contends Dr. Bean admitted at trial that his calculations were based on a
mistaken assumption that Melissa’s birth date was 1962, when it was actually
1952, and therefore his opinions are legally insufficient because they are
based on this incorrect information.  Christus asserts that the jury
nevertheless awarded the “exact amount” of custodial care Dr. Bean had
calculated—$1,075,000.  We disagree with Christus’s characterization of the record
and the jury’s award. 

            Dr.
Bean’s original calculation for care for Timothy alone was $1,174,000.  In
addition, however, he testified that pecuniary losses would include lost income
of $435,700, and loss of household services of $422,043.  Thus, using these
calculations, the jury could have begun its deliberation with evidence of pecuniary
losses totaling $2,031,743.  After Dr. Bean’s mistake was discovered, he
revised some of his calculations accordingly: (1) the estimate for care for Timothy
changed from $1,174,000 to $230,000; (2) the lost wages number was reduced from
$435,000 to $80,000; and (3) the calculations for household services remained
the same at $422,043.  The revised figures totaled $732,043.

            Although
Dr. Bean’s revised total is less than the amount the jury awarded for pecuniary
loss from his mother’s death, this does not mean that the award is legally
insufficient.  Pecuniary loss in a wrongful-death case is not subject to
precise mathematical calculation, and the jury is given significant discretion
in determining this element of damages.  Thomas v. Uzoka, 290 S.W.3d
437, 454 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); Samco Props.,
Inc. v. Cheatham, 977 S.W.2d 469, 480 (Tex. App.—Houston [14th Dist.] 1998,
pet. denied) (“measuring a beneficiary’s pecuniary loss in inherently
speculative and imprecise and is therefore best left to the jury’s common sense
and sound discretion.”).  Pecuniary losses may be recovered even in the absence
of specific evidence of the amount of contributions being made by the deceased
before her death or that she would have continued to contribute in the future. 
Thomas, 290 S.W.3d at 454.  Thus, a jury determining pecuniary loss may
look beyond evidence of calculable financial contributions, and is not
necessarily limited by an economist’s testimony about some of the
considerations included in pecuniary loss.  On this record, therefore, we
conclude that legally sufficient evidence supports the jury’s award of
pecuniary damages to Timothy.  We overrule Christus’s second issue.

C

            In
its third issue, Christus contends that a previous settlement for custodial
care renders the award of pecuniary damages to Timothy a double recovery.  This
issue incorporates several sub-issues:  (1) the award constitutes a double
recovery barred by the one-satisfaction rule, see, e.g., Crown Life
Ins. Co. v. Casteel, 22 S.W.3d 378, 390–91 (Tex. 2000); (2) the trial court
erred in not submitting the settlement agreement to the jury; and (3) alternatively,
the trial court erred by denying Christus’s request that Timothy’s future
custodial care be awarded in periodic payments in the future rather than a
lump-sum payment.  We address each in turn.

1

            In
its argument that the award violates the one-satisfaction rule, Christus again contends
the only evidence of pecuniary loss to Timothy was custodial care.  Christus
then points to a settlement the Dorrietys reached in 1984 in a lawsuit they filed
alleging that Timothy experienced a birth injury, which provided funds for the
Dorrietys’ claimed medical and custodial-care expenses.  Christus maintains
that the Dorrietys presented no evidence that Timothy needed additional or
different custodial care after Melissa’s death, and Dr. Bean admitted that the “care
for Timothy” category of damages was custodial care.[3]  Therefore,
Christus argues, the damages for custodial care were compensated in the
settlement agreement and allowing this double recovery for Timothy’s “identical
and indivisible” injury would result in a windfall to the Dorrietys.

            The
one-satisfaction rule applies to prevent a plaintiff from obtaining more than
one recovery for the same injury.  Stewart Title Guar. Co. v. Sterling,
822 S.W.2d 1, 7 (Tex. 1991).  The rule applies when multiple defendants commit
the same act as well as when defendants commit technically different acts that
result in a single injury.  Casteel, 22 S.W.3d at 390.  This case,
however, involves two meaningfully different injuries, and two separate and
distinct victims of different acts of malpractice:  (1) the injuries to Timothy
during his birth, which caused a life-long mental handicap, and (2) the
injuries to Melissa resulting from Christus’s negligence, which caused her
death.  The 1984 settlement compensated Timothy for the things he can no longer
do for himself; the 2009 judgment compensated Timothy for the things that
Melissa can no longer do for him.  

            Moreover,
the “custodial care” damages included in Timothy’s birth-injury case are not
identical to the damages awarded here for the wrongful death of his mother. 
The 1984 settlement resolved the Dorrietys’ claims for damages resulting from
the birth injuries to Timothy.  The settlement agreement in that suit recites the
damages that were included in the settlement payment:  “monetary damages on
account of personal injuries, including pain and suffering, mental anguish,
physical impairment, physical disfigurement, lost earning capacity and medical
and custodial care expenses.”  In the present case, the recoverable damages for
Timothy were defined as “the loss of the care, maintenance, support, services,
advice, counsel, and reasonable contributions of an actual economic value that
Timothy Dorriety, in reasonable probability, would have received from Melissa
Dorriety had she lived.”  Thus, this case encompasses a type of damage wholly
separate from the type of “custodial care” damages anticipated in the birth
injury case.  For example, the evidence supporting the jury’s finding included
the following:

·       
Melissa’s
value to the family was “priceless.”

·       
Melissa
would assist in taking Timothy to speech, getting him dressed, getting him to
Brookwood Community, where he worked, and cooking for him.

·       
Melissa
worked to accommodate Timothy’s preferences, keep him on a schedule, and keep
his environment safe. 

·       
Melissa
administered Timothy’s medicine and cleaned up after him.

·       
Melissa
was Timothy’s primary caretaker, and Timothy was closest to her.  

·       
Melissa,
along with her husband, actively worked to “support and nurture [Timothy] and
continue to bring him up and keep him challenged . . . where . . . he stayed .
. . interested in things.  Because we never did want to let him just achieve a
status quo where he would start deteriorating in his abilities.”

The
argument advanced by Christus that any damages based on these contributions are
identical to the unspecified settlement monies for “custodial care” ignores the
value of the contributions made by Melissa to her son.  Although some of the
damages awarded to Timothy may, of necessity, include the cost of attendant or
custodial care, labeling the pecuniary losses in this case as merely “custodial
damages” disregards the intended goal of this category of damages, which
is to remedy all of the economic consequences relating to a child’s loss of his
mother.  There is no evidence in the record to show that these contributions by
Melissa were the same and those described in the 1984 settlement.  

            Although
neither party identifies a standard of review we are to apply, this court has
previously held that the abuse-of-discretion standard of review applies to a trial
court’s determination as to whether the one-satisfaction rule bars a particular
recovery.  LJ Charter, L.L.C. v. Air Am. Jet Charter, Inc., No.
14-08-00534-CV, 2009 WL 4794242, *7 (Tex. App.—Houston [14th Dist.] Dec. 15,
2009, pet. denied) (citing Oyster Creek Fin. Corp. v. Richwood Invs. II,
Inc., 176 S.W.3d 307, 326 (Tex. App.—Houston [1st Dist.] 2004, pet. denied)). 
A trial court abuses its discretion by acting arbitrarily, unreasonably, or
without consideration of guiding principles.  Walker v. Gutierrez, 111
S.W.3d 56, 62 (Tex. 2003).  Here, the trial court had before it the settlement
agreement and the evidence of Melissa’s “care, maintenance, support, services,
advice, counsel, and reasonable contributions” given to Timothy, and determined
that the one-satisfaction rule did not apply to limit or preclude the recovery
of pecuniary damages for Timothy’s loss of his mother.  We conclude that, on
this record, the trial court did not abuse its discretion or otherwise err in concluding
that the one-satisfaction rule does not bar recovery.

            Christus
also contends the trial court erred by refusing Christus’s tendered jury
question and instruction, which contained a separate blank for the jury to
specify the amount of custodial damages.  As a result, Christus argues, the
jury did not have the opportunity to award a specific dollar amount solely for
custodial care.  Christus concludes that the refusal of its requested question
and instruction probably resulted in the rendition of an improper judgment and
prevented Christus from properly presenting the issue regarding the asserted double
recovery for custodial care on appeal.  See Tex. R. App. P. 44.1(a); Harris
County v. Smith, 96 S.W.3d 230, 233–34 (Tex. 2002).

            But
Christus does not explain how the trial court’s alleged error prevented it from
properly presenting the asserted double recovery for custodial care to this
court.  See Harris County, 96 S.W.3d at 235.  Specifically, Christus has
not explained in its brief how the refusal to break out a separate damages
blank for custodial care prevented it from demonstrating on appeal that the
trial court erroneously analyzed the application of the one-satisfaction rule. 
Indeed, Christus argues the one-satisfaction rule at length.  Nowhere does Christus
explain how it has been prevented from making the one-satisfaction arguments it
wants to make on appeal because the custodial damages award was not broken out
separately.  Accordingly, Christus fails to demonstrate why broad-form
submission, which is mandated “whenever feasible” under Texas Rule of Civil
Procedure 277, was not “feasible” in this particular case.  See Tex. R.
Civ. P. 277.

            We
therefore conclude that the trial court did not err by refusing to apply the
one-satisfaction rule and rejecting Christus’s requested jury question and
instruction.

2

            Christus
next contends the trial court made a “factual error” by refusing to admit the
settlement agreement into evidence so the jury would have had the opportunity
to consider whether the settlement compensated for custodial care.  Consistent
with its previous arguments, Christus maintains that the only evidence of
pecuniary damages as to Timothy were “solely custodial care,” and therefore the
jury should have been given an opportunity to consider whether an award of
custodial damages constituted a double recovery, given that the settlement
agreement “provides for the same.”  But we have already rejected the premise of
this assertion, and because there was no error in the trial court’s conclusion
that the pecuniary damages sought on Timothy’s behalf would not result in a
double recovery barred by the one-satisfaction rule, the exclusion of the
settlement agreement did not probably cause the rendition of an improper
judgment or prevent Christus from presenting this case to the court of appeals. 
See Owens-Corning Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998) (stating
that evidentiary rulings are committed to the trial court’s sound discretion
and must be upheld if there is any legitimate basis for the ruling).

3

            Lastly,
Christus contends in the alternative that the trial court erred by denying its
motion for future periodic payments.  Christus requested that the trial court
order Timothy Dorriety’s future custodial care ($1,000,000 of the total awarded
for past and future pecuniary losses) be awarded in periodic payments in the
future rather than a lump-sum payment.  See Tex. Civ. Prac. & Rem.
Code § 74.503(a).  Christus asserts that the provision is mandatory, and
therefore a trial court must order periodic payments upon the request of a
defendant.  

            Section
74.503 provides in relevant part as follows: 

(a) At the request of a defendant physician or health care
provider or claimant, the court shall order that medical, health care,
or custodial services awarded in a health care liability claim be paid
in whole or in part in periodic payments rather than by a lump-sum payment. 

(b) At the request of a defendant physician or health care
provider or claimant, the court may order that future damages other
than medical, health care, or custodial services awarded in a health
care liability claim be paid in whole or in part in periodic payments rather
than by a lump sum payment.

Tex.
Civ. Prac. & Rem. Code § 74.503(a), (b) (emphasis added).  Subsection (a)
provides that the court “shall” grant a request for periodic payments for
certain types of claims, including claims for custodial care upon request. 
Subsection (b) provides that the court “may” order periodic payments upon
request for future damages other than medical, healthcare, or custodial
services.  Thus, the statute has both mandatory and discretionary components. 
Christus contends its request for an order places this case under the mandatory
part of the statute because damages awarded to Timothy consisted entirely of
custodial services.  Again, Christus’s argument is based on the erroneous
premise that the award of pecuniary damages to Timothy was for nothing more
than “custodial services.”  

            As
discussed above at length, Timothy was awarded future “pecuniary losses” which
were defined broadly to include “the loss of the care, maintenance, support,
services, advice, counsel, and reasonable contributions of an actual economic
value” that Timothy would have received from Melissa if she had lived.  This category
of damages contemplates economic losses incurred by Timothy as a result of the loss
of his mother’s unique, familial contributions of various kinds, and so does not
correspond to “custodial services” that may be obtained in the marketplace.  Further,
we presume that if the legislature intended to make awards of “pecuniary
losses” subject to subsection (a), it could have included the term.  See
Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 540 (Tex. 1981)
(explaining rule of statutory construction that every word of a statute must be
presumed to have been used for a purpose and, likewise, every word excluded
from a statute must also be presumed to have been excluded for a purpose).

            Thus,
we conclude that damages for pecuniary losses such as those awarded here are
not encompassed by the term “custodial services,” and therefore the award is
governed, not by subsection (a) as Christus contends, but by subsection (b),
which provides that the trial court “may” in its discretion order periodic
payments.  See id. § 74.503(b).  Accordingly, the trial court’s refusal
to order periodic payments of the pecuniary losses awarded to Timothy was
wholly within the trial court’s discretion.  

            We
overrule Christus’s third issue.

D

            In
its fourth issue, Christus contends the trial court erred in awarding the full
amount of court costs to the appellees, despite the fact they did not prevail
on all claims.  Specifically, Christus contends that the Dorrietys did not
prevail against Dr. Mehta, and therefore the court costs related to Dr. Mehta
should not be taxed to Christus.  We review the award of costs under an abuse-of-discretion
standard.  Furr’s Supermarkets, Inc. v. Bethune, 53 S.W.3d 375, 376
(Tex. 2001).

            Under
Rule 131 of the Texas Rules of Civil Procedure, “[t]he successful party to a
suit shall recover of his adversary all costs incurred therein, except where
otherwise provided.”  See Tex. R. Civ. P. 131.  This court has defined a
“successful party” as “one who obtains judgment of a competent court vindicating
a civil right or claim.”  City of Houston v. Woods, 138 S.W.3d 574, 581
(Tex. App.—Houston [14th Dist.] 2004, no pet.).

            Here,
the Dorrietys obtained a judgment vindicating their claim and, therefore,
according to Rule 131, are entitled to recover “all costs.”  See Williamson
v. Roberts, 52 S.W.3d 354, 356 (Tex. App.—Texarkana 2001), aff’d,
111 S.W.3d 113 (Tex. 2003) (“A plaintiff who prevails on one claim but not
others in the same suit is a successful party.”).  Therefore, we conclude the
trial court did not abuse its discretion in ordering that Christus shall bear all
taxable costs. 

            We
overrule Christus’ fourth issue.

*
* *

            Having
overruled Christus’s issues, we affirm the trial court’s judgment.








                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

Panel consists of Justices Brown, Boyce,
and Jamison.









[1]
Plaintiff’s Exhibit 11 is a summary of the amounts paid, and was admitted
without any objection regarding reasonableness and necessity.





[2]
Dr. Bean explained further that this type of attendant was not a nurse, but
someone whose primary responsibility would be to watch over Timothy and assist
him with basic needs.





[3]
Christus relies on the following testimony of Dr. Bean during
cross-examination:  

Q.        (Counsel for Christus) Now, the – the Tim
care, and I’ve it circled [sic], is that one million, one seventy-four?

A.        (Dr. Bean) Yes. 

Q.        That’s custodial care for Tim?

A.        Well, yes . . . .

            * * *

Q.        . . . that’s an example of custodial care
for Tim? 

A.        It’s an example of an attendant in his home.

Q.        Right.  To – to care for him?

A.        Yes.