**Opinion issued November 19, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01156-CV

————————————

**CINDI HEDGEPETH, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JOHN TIMOTHY HEDGEPETH, Appellant**

**V.**

**DIAMOND OFFSHORE DRILLING, INC., Appellee**

---

**On Appeal from the 133rd District Court
Harris County, Texas
Trial Court Cause No. 2010-61705**

---

## MEMORANDUM OPINION

Cindi Hedgepeth appeals a jury award in a wrongful death case under the Jones Act. *See* Merchant Marine Act of 1920 (Jones Act), 46 U.S.C.S. §§ 30104–30106 (LexisNexis 2007 & Supp. 2013). A jury awarded Cindi $280,082 for the

loss of her late husband's support and household services. Cindi contends the award is inadequate and the evidence is factually insufficient to support the award. We affirm.

## Background

John Timothy Hedgepeth (Tim) worked as an electrician for Diamond Offshore Drilling, Inc. In December 2008, Diamond sent Tim to the Ocean Lexington, an oil rig stationed off the coast of Libya. Diamond arranged Tim's travel itinerary, which included a layover in Malta. In Malta, Tim died from pneumococcal meningitis, a bacterial infection that affected his brain. Tim was 52 years old when he died.

Tim's widow, Cindi, sued Diamond under the Jones Act. Cindi alleged Diamond had a legal duty to provide Tim a safe place to work, Diamond breached its duty, and Diamond's breach caused Tim's death. Diamond generally denied the allegations and claimed Tim's negligence caused his death.

At trial, Cindi testified about her life with Tim. She testified that when Tim was working offshore, he worked 30 days on and 30 days off. She also testified that she and Tim were married 33 years, that Tim spent a lot of time with family when he was not working, that Tim raised show horses with their oldest daughter, and that the family frequently went to horse shows.

2

Cindi testified that Tim worked for Diamond on two separate occasions. Tim started working for Diamond in 1993, then left Diamond in 1996 to work for Georgia Pacific Paper Mill. Tim earned $50,000 less per year working for Georgia Pacific, but the paper mill was close to home and Tim wanted more time with his family. Cindi testified that Tim returned to Diamond in 2006 because Georgia Pacific changed management and Tim disliked the new owners.

Cindi introduced expert testimony valuing the loss of Tim's support and household services. Economist Thomas Mayor testified that he calculated three numbers: past lost support, future lost support, and lost household services.

Mayor testified that in order to reach a lost support calculation, he first estimated Tim's annual net earning capacity. Mayor testified that in order to determine what Tim may have earned in the future, he looked at past tax returns and W-2 statements. Mayor testified that he made separate onshore and offshore calculations, because Tim had worked an onshore job for Georgia Pacific for several years before working for Diamond. He assumed that if Tim continued working offshore, he would make the same amount that he made in his last year working for Diamond. He assumed that if Tim took an onshore job, he would make the same amount that he made in the last year at Georgia Pacific. Mayor then added 13 percent to those figures to account for lost fringe benefits, such as medical insurance benefits and retirement plans. The 13 percent was not based on

3

Tim's actual fringe benefits, but rather, government statistics showing that the average value of fringe benefits is 13 percent of wages. On cross-examination, Mayor testified that information from Diamond indicated that its benefits were slightly better than average. Mayor deducted amounts attributable to payroll taxes, federal income tax, and state income tax, based on Tim's previous tax returns, to arrive at a net annual income figure of $79,249 for onshore work, and $136,252 for offshore work.

Mayor testified that he then subtracted from the net annual income figures an allowance for personal consumption, because part of what Tim earned would have been spent on items for his own personal consumption and would not have benefitted the family. Mayor testified that personal consumption items could include personal food, personal clothing, personal entertainment, and "personal incidental." Mayor testified that studies typically show that in an average income family, the personal consumption allowance of the husband ranges from 20 to 30 percent. However, Mayor applied a 12 percent personal consumption allowance to the offshore figure, on the basis that studies show that when a family has a higher income, the personal consumption allowance tends to be smaller. Mayor testified that, because Tim made roughly $144,000 in his last year of life while working offshore, the studies would indicate that the personal consumption allowance should be adjusted based upon the fact that this income was three times the average

4

income.  For the same reason, Mayor applied a 16 percent personal consumption allowance to onshore figures.  Mayor testified that the personal consumption allowances were based on the assumption that Tim "would have been an average personal consumer."

On cross-examination, Mayor admitted that he did not attempt to calculate a personal consumption allowance based on data specific to Tim, and in particular, did not try to account for expenses associated with showing horses.  Mayor testified that he did not attempt to account for show horse expenses because it was not clear that the hobby was specific to Tim as opposed to a family hobby.  Mayor testified that, as a jury member in determining the appropriate personal consumption allowance, he "would want to . . . see if there is anything unusual in that consumption pattern," giving the examples of an expensive hobby like African hunting trips or an expensive health problem that was not covered by health insurance.

After deducting the personal consumption allowance from the net annual income figures, Mayor calculated past lost support by multiplying the remainder by the number of years between the date of Tim's death and the date of trial, which was almost three and one half years.  This resulted in a past lost support figure of $221,809, assuming onshore work, or $399,513, assuming offshore work.

5

Mayor testified that the future lost support calculations were "more complicated," because they required future projections, determining the present value of a future stream of lost earnings, and additional assumptions. Mayor testified that the future lost support calculations assumed:

- "Average typical wage increases" of 1.25 percent a year above the rate of inflation, based upon the average typical wage increase over the last 50 years.
- Any money awarded would earn one and a half percent interest after inflation.
- Tim would work for another 11.7 years after the age of 52, until the age of 63.7, based upon statistical tables.

Mayor adjusted the future lost support figures by the personal consumption allowances and concluded that future lost support was $531,534, assuming onshore work, or $957,379, assuming offshore work.

Mayor testified that combining the past and future lost support yielded a total lost support of $753,343, assuming onshore work, or $1,356,892, assuming offshore work.

Mayor also testified about the value of the household services provided by Tim. According to Mayor, household services can include, among other things, taking care of the yard, doing work inside, repairing the house, painting a house, taking care of vehicles, paying bills, contracting for people to take care of the house, going to the store to pick up things for the family, and taking care of small children. Mayor testified that, based on government statistics, the national average

6

value of household services performed by a married man without small children who is employed full-time is $9,632 a year. Accounting for wage rates in Mississippi, where Tim lived, that figure was $7,705 per year. According to Mayor, if the man is retired, the figure adjusts to $12,979 a year. Mayor testified that he did not try to determine whether Tim was an above average, average, or below average provider of household services, and that he did not know how, on balance, Tim's working offshore would affect the level of household services he provided. Assuming a life expectancy of 79.4 years, Mayor testified that the total value of lost household services was $280,082.

Mayor testified that the sum of past and future lost support, assuming offshore work, plus household services, was $1,636,974.

Diamond's expert, economist Stuart Wood, offered alternative calculations. Like Mayor, Wood calculated two sets of lost support figures, one assuming that Tim continued to work offshore, and one assuming that he worked onshore. Wood based his net annual income figures on the same past income figures as Mayor, but did not include any amounts for fringe benefits.

Wood testified that the calculation of a personal consumption allowance is a "complicated thing . . . [which] is based upon the individual consumption patterns of individual people." Wood testified that he used a scale published by the U.S. Department of Labor and another study, which indicate that the allowance for joint

consumption in a two-person family is 66 percent. Accordingly, he applied a 33 percent personal consumption allowance to the net annual income figures to determine lost support. He told the jury that, contrary to Mayor's testimony, recent studies show that personal consumption allowances do not significantly decrease as income rises. Wood thus calculated the amount of past lost support to be $142,579.48, assuming onshore work, or $225,195.19, assuming offshore work.

Like Mayor, Wood testified that his future lost support calculations included several assumptions, among them, the assumption that Tim would have worked another 7.61 years from the date of trial, which was an average based upon Tim's demographic characteristics. The future lost support calculations also included assumptions about economic conditions, the type of industry, and the growth range of income based upon Tim's age, and the proper discount to present value, which Wood based upon the interest rate of United States treasury securities. Based on these assumptions and a 33 percent personal consumption allowance, Wood calculated future lost support to be $325,227.76, assuming onshore work, or $514,192.34, assuming offshore work.

Wood concluded that total lost support, assuming onshore work, was $467,807.24. Assuming offshore work, Wood calculated total lost support to be $739,387.53.

8

Regarding household services, Wood testified that "this is a thing that depends upon the specifics of the individual." Wood agreed with Mayor that there were "difficulties [with] trying to annualize for a man who works 50 percent of time offshore and at home." Like Mayor, Wood did not base his figure on specific information about the services provided by Tim, but rather, based his figure on an average derived from statistical studies. Wood reached his household services figure by using a general assumption regarding the time and value for Tim's household services, based upon a national average of 14 hours devoted to household services per week at 52 weeks a year, multiplied by the minimum wage. Using this calculation, Wood arrived at a figure for lost household services of $57,961.30.

In short, Wood testified that total lost support based on the assumption of onshore work, plus fringe benefits, and his estimate of household services, was $682,719.70. The same sum, assuming lost support based on offshore work, was $954,269.99.

The jury found both Diamond and Tim negligent, assessing 25% against Diamond and 75% against Tim.[1] The jury awarded $0 for Tim's pre-death pain,

---

[1] In a cause of action under the Jones Act, a seaman's contributory negligence does not bar recovery, but diminishes damages on the basis of comparative negligence in proportion to the amount of negligence attributable to contributory fault. *See Noble Drilling (US) Inc. v. Fountain*, 238 S.W.3d 432, 440 (Tex. App.—Houston [1st Dist.] 2007, pet. denied).

9

suffering, and mental anguish, and $280,082 for the loss of Tim's support and household services. Cindi moved for a new trial, contending the award for support and household services was inadequate and the evidence was factually insufficient to support the award.[2] The trial court denied Cindi's motion. This appeal followed.

## Discussion

On appeal, Cindi contends that the jury's award of $280,082 for lost support and household services is supported by factually insufficient evidence.

### A. Standard of Review

The Jones Act provides for a wrongful death action for maritime workers who die from injuries sustained in the course of employment. *See* 46 U.S.C.S. § 30104. When a state court hears an admiralty case, that court occupies essentially the same position occupied by a federal court sitting in diversity: the state court must apply substantive federal maritime law but follow state procedure. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). We review a jury's award of pecuniary damages under the Jones Act under the traditional standard of review for factual sufficiency under Texas law, considering and weighing all of the evidence, not just that evidence which supports the verdict. *Id.*

---

[2] Cindi does not challenge the award on the basis that the jury awarded $0 for support, because damages for support and household services were submitted in a single broad-form question, and Cindi did not object to this submission.

10

at 406–07; *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003).  We can set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Ellis*, 971 S.W.2d at 407; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).  We conduct a factual sufficiency review in light of the jury instructions.  *Golden Eagle Archery*, 116 S.W.3d at 762; *Crounse v. State Farm Mut. Auto. Ins. Co.*, 336 S.W.3d 717, 719 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  Unless the record demonstrates otherwise, we presume the jury followed the trial court's instructions.  *Golden Eagle Archery*, 116 S.W.3d at 771.  We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result.  *Ellis*, 971 S.W.2d at 407.

## B. Applicable Law

Recovery of damages under the Jones Act is limited to pecuniary losses.  *De Centero v. Gulf Fleet Crews, Inc.*, 798 F.2d 138, 141 (5th Cir. 1986).  In a wrongful death case under the Jones Act, recoverable items include, among others, loss of support from past and future earnings, loss of household services, and recovery for pre-death pain and suffering.  *Id.*

The jury generally has broad discretion to award damages within the range of evidence presented at trial.  *Weeks Marine, Inc. v. Salinas*, 225 S.W.3d 311, 319–20 (Tex. App.—San Antonio 2007, pet. dism'd) (citing *Gulf States Utilities,*

11

*Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) and *Vela v. Wagner & Brown, Ltd.*, 203 S.W.3d 37, 49 (Tex. App.—San Antonio 2006, no pet.)). A jury is entitled to disbelieve or discount any part of an expert's testimony even though the basis of the jury's specific calculation cannot be determined from the record. *Salinas*, 225 S.W.3d at 320; *see, e.g.*, *Pleasant v. Bradford*, 260 S.W.3d 546, 560 (Tex. App.—Austin 2008, pet. denied) (citing *Parallax Corp., N.V. v. City of El Paso*, 910 S.W.2d 86, 91–92 (Tex. App.—El Paso 1995, writ denied)). A jury is entitled to make credibility determinations and weigh competing expert testimony and the variables and assumptions upon which that testimony is based. *Salinas*, 225 S.W.3d at 320. A jury "may disregard even uncontradicted and unimpeached testimony from disinterested witnesses," so long as the decision to disregard is reasonable. *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005).

Pecuniary loss in a wrongful-death case is not subject to precise mathematical calculation, and the jury is given significant discretion in determining this element of damages. *Christus Health v. Dorriety*, 345 S.W.3d 104, 113 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing *Thomas v. Uzoka*, 290 S.W.3d 437, 454 (Tex. App.—Houston [14th Dist. 2009, pet. denied). "[A] jury determining pecuniary loss may look beyond evidence of calculable financial contributions, and is not necessarily limited by an economist's testimony about some of the considerations included in pecuniary loss." *Id.*

12

## C. Analysis

Here, the jury was asked to "[s]tate the amount of damages you award to Plaintiff Cindi Hedgepeth" for "[t]he loss of John Timothy Hedgepeth's Household Service and Support." The trial court's charge instructed the jury, if it found that Cindi was entitled to an award for the "loss of future support and services," to "reduce any loss of support . . . by the amount you determine [Tim] would have consumed himself." The jury was also instructed to "consider loss after income taxes" and to "discount [any award] to present value by considering what return would be realized on a relatively risk free investment." Additionally, the trial court instructed the jury not to reduce the award by the percentage of contributory negligence it assigned to Tim, if any, because making that reduction was the court's responsibility. The jury awarded $280,082.

Cindi acknowledges that the jury is entitled to disregard or discount expert testimony, but asserts that, because Diamond sponsored Wood's testimony regarding lost support and household services, his testimony provides the absolute floor for the award of lost support and household services. In response, Diamond contends that the jury was not bound to accept either expert's testimony, and the jury's award is supported because the jury could have concluded that Tim was not going to continue working offshore and that Tim had a higher personal

13

consumption percentage than assumed by either expert, because of his hobby of showing horses.

We agree with Diamond that Wood's testimony did not create an absolute floor for the jury's award. Because pecuniary loss is not subject to precise mathematical calculation, the jury had significant discretion in determining this element of damages. *See Dorriety*, 345 S.W.3d at 113. The jury was entitled to disbelieve or discount any part of *either* expert's testimony, to weigh both experts' testimony and the variables and assumptions upon which each expert's testimony was based, and to reject or discount each expert's testimony based on this review. *See City of Keller*, 168 S.W.3d at 820; *Salinas*, 225 S.W.3d at 320–21.

Both Mayor and Wood testified that their calculations of lost support were based upon various assumptions. The experts' assumptions differed, and in many cases were based upon generalized data or studies, not data unique to Tim. The jury was entitled to disbelieve or discount the assumptions made by either expert. *See City of Keller*, 168 S.W.3d at 820; *Salinas*, 225 S.W.3d at 320–21.

For example, the jury could have concluded that, based on the fact that Tim had previously decided to work onshore in order to be closer to his family, he would do so again, and therefore rejected the experts' offshore figures. The jury also could have concluded that a change to an onshore job may have resulted in less valuable pay and benefits than those Tim received from either Diamond or his

14

previous onshore job at Georgia Pacific. The jury was not required to accept either expert's assumption about how long Tim would continue to work. Cindi testified that Tim was very involved with his family, and had previously taken a $50,000 pay cut to take a job onshore in order to spend more time with them. The jury also could have concluded that Tim would retire before the date that either expert assumed, in order to spend more time with his family.

Further, the jury could have determined that neither expert accurately calculated Tim's personal consumption allowance, because neither expert based his allowance on Tim's actual consumption rate. *See Salinas*, 225 S.W.3d at 320–21. The experts' personal consumption allowance numbers differed greatly—Mayor applied a 12 percent allowance to offshore work and a 16 percent allowance to onshore work, while Wood applied a 33 percent allowance to both figures. But the jury could have disregarded these figures because, although Cindi contends that showing horses was not a personal expense since her adult daughter showed them with Tim, the evidence adduced at trial could permit the jury to determine that Tim's personal consumption allowance was higher because he showed horses and even Cindi described this as a "luxury."

In addition, the jury could have discounted both experts' figures regarding the value of lost household services because neither considered actual services rendered by Tim. Both experts used national averages even though they agreed

15

that there were "difficulties" associated with calculating the value of household services contributed by a person who was offshore for 30 days at a time. Cindi's expert, Mayor, admitted that he didn't know "how much difference that makes," and stated that "[i]t's a hard–I think it's a hard issue to determine." Accordingly, the jury could have determined that neither expert's household services figure was accurate and that a lower figure was warranted.

We do not speculate on how the jury actually arrived at its award, but conclude based upon all of the foregoing that there is sufficient evidence in the record from which a rational jury could have determined an award lower than either expert estimated. *See Vela*, 203 S.W.3d at 49 (reviewing court does not speculate on how jury actually arrived at award, but rather, determines whether jury could have reasonably reached award based upon record evidence). Having considered all of the evidence, in light of the jury's significant discretion in determining pecuniary damages, we conclude that the jury's award of $280,082 for loss of support and household services is not so contrary to the overwhelming weight of the evidence that it is clearly wrong and unjust. *See Dorriety*, 345 S.W.3d at 113 (jury has significant discretion in determining pecuniary damages and is not necessarily limited by expert testimony); *Salinas*, 225 S.W.3d at 320 (jury is entitled to disbelieve or discount any part of an expert's testimony even

16

though the basis of the jury's specific calculation cannot be determined from the record).

We overrule Cindi's sole issue.

## Conclusion

We affirm the trial court's judgment.


Rebeca Huddle
Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.