

# COURT OF APPEALS

**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

**NO. 02-15-00111-CV**

AZLE MANOR, INC.                                                     APPELLANT

V.

PATTY PATTERSON AND PAMELA                                   APPELLEES
BEAVERS, INDIVIDUALLY AND AS
REPRESENTATIVES OF THE
ESTATE OF MARY ANN DAVIS,
DECEASED

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 048-260807-12

----------

## MEMORANDUM OPINION[1]

----------

Appellees Patty Patterson and Pamela Beavers, individually and as

representative of the estate of Mary Ann Davis, their mother, sued Appellant

---

[1]*See* Tex. R. App. P. 47.4.

Azle Manor, Inc. after Davis's death. After a jury trial, the trial court rendered a judgment awarding Beavers and Patterson damages of $65,000 and $45,000, respectively, in their individual capacities and awarding Patterson $104,500 as representative of Davis's estate.

There are four issues in this appeal. First, was the evidence legally and factually sufficient to support a finding of negligence on the part of Azle Manor? Second, did the trial court abuse its discretion by excluding a report from the Texas Department of Aging and Disability Services (DADS)? Third, was Azle Manor entitled to a jury instruction on lost chance of survival? And finally, was the evidence legally and factually sufficient to support the award of past medical expenses? Because we hold that the trial court property excluded the DADS report, Azle Manor was not entitled to a lost chance of survival instruction, and the evidence was sufficient to support the jury's verdict, we affirm.

## Background

In their petition, Patterson and Beavers alleged that at the time of Davis's death, she was a resident and patient at Azle Manor. They further alleged that despite Davis's having a known risk of falling, one of Azle Manor's employees was negligent in assisting Davis in moving from her wheelchair to her bed, that consequently Davis fell on her face, and that the fall caused subarachnoid hemorrhages in her brain that led to further complications and ultimately her death. They alleged that the employee should have used a belt, more specifically identified at trial as a "gait belt," to assist in moving Davis.

2

Patterson and Beavers asserted claims of negligence and for wrongful death under chapter 71 of the civil practice and remedies code. Patterson's and Beavers's other siblings were also plaintiffs initially but nonsuited their claims before trial.

Patterson had asked DADS to investigate Davis's fall, and at the beginning of trial, Azle Manor asked the trial court to rule on the admissibility of DADS's report from its investigation. The report listed the allegations made, and next to each allegation, a box for "Unsubstantiated" was checked. Azle Manor offered it as a public document and argued that it was admissible hearsay. The trial court sustained Patterson and Beavers's objection to the report. But the court stated that if, because of "something [that] comes up later," Azle Manor wanted to "offer other parts of it[,]" the court would address the admissibility of that part of the report at that time. The trial court overruled a later attempt by Azle Manor to have the report admitted.

Azle Manor also objected to the admission of a report by the paramedics who took Davis to the hospital after her fall. In the report, a paramedic stated that when they arrived at Azle Manor, they found Davis "in bed in care of Nursing staff who reported an aide [had] attempted to place [Davis] in bed from wheel chair without using a belt and dropped [Davis] on her face causing an hematoma." The trial court overruled the objection.

Patterson and Beavers introduced evidence of a second explanation for Davis's fall. In a handwritten note, Azle Manor nurse Christie Batey stated that

3

right before the fall, she was moving Davis in her wheelchair from the nurse's station to Davis's room when she noticed that Davis had lost a shoe. Batey stopped and turned around to pick up the shoe. She handed Davis the shoe and put her hands on the back of Davis's chair, and at that point, Davis toppled forward out of her chair, landing on her head. Davis instantly developed a softball-sized knot on her forehead.

During trial, Dr. Joe Ventimiglia testified that Azle Manor was negligent in its care of Davis, that he had reviewed Davis's medical billing records, that Davis's medical expenses were caused by Azle Manor's negligence and the charges were reasonable and necessary, and that Davis would not have needed any of the services billed for but for her fall.

No physician testified for Azle Manor. Its sole witness at trial was Libby High Poston, a psychiatric nurse practitioner who works at (but is not an employee of) Azle Manor and who worked with a primary care physician and a psychiatrist consulting at Azle Manor to help oversee Davis's care.

At the charge conference, Azle Manor requested an instruction on lost chance of survival. The trial court overruled the requested instruction.

The jury found that Azle Manor proximately caused Davis's death and found damages for Davis of $90,000 for mental anguish and $14,500 for past medical expenses. The jury further found that Patterson was entitled to $15,000 for loss of companionship and society and $50,000 for past mental anguish and

4

that Beavers was entitled to $5,000 for loss of companionship and society and $40,000 for past mental anguish.

The trial court's judgment awarded Patterson $104,500 as representative of Davis's estate and awarded her $65,000 individually. The judgment awarded Beavers $45,000 individually.

**Discussion**

### I. Sufficiency of the evidence supporting the negligence finding

In its first issue, Azle Manor argues that the evidence was legally and factually insufficient to support the jury's answer that Azle Manor's negligence proximately caused Davis's death.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact.[2] In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a

---

[2] *See Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999).

reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.[3]

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered.[4]

*A. Ventimiglia's qualifications*

Azle Manor challenges Ventimiglia's qualifications as an expert on proximate cause and on the standard of care applicable to nursing homes or nurses and nurse aides at nursing homes. It argues that Ventimiglia provided "generic testimony" that did not show his qualifications to testify about the issues before the court.[5] The issue at trial was whether Azle Manor's breach of the

---

[3]*Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

[4]*Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

[5]*See Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 363 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (stating that the defendant framed the standard required for testifying experts too narrowly and that the doctor in that case had the knowledge, skill, experience, training, or education regarding the specific issue before the court to qualify to give an opinion on the specific issue before the court).

standard of care owed to Davis, an elderly patient prone to falling from her wheelchair, caused Davis's fall and whether that fall caused the injuries she suffered that led to her death.

Ventimiglia testified that he is the medical director of a hospice[6] with experience in treating elderly patients, including treating patients in a nursing home environment. He has experience in treating patients at risk of fall injuries, including falls from wheelchairs.

In his expert report and curriculum vitae (CV), Ventimiglia stated that he is a licensed physician in the state of Texas and is board certified in family medicine. He has "special experience and interest in the care of geriatric patients and the homebound chronically ill" and "extensive experience teaching and presenting the important aspects of . . . hospice care at local and state meetings." He practices "outpatient primary care in both general family medicine as well as in a number of focused areas of primary care including but not limited to hospice and palliative care . . . and restorative medicine" and "supervise[s] the provision of primary medical care to a large number of homebound patients in the house call practice." And he "provide[s] direct care to a large number of children and adults in three ambulatory clinic settings in the Dallas Fort Worth area" and "provide[s] hospice and palliative care to numerous adults" in his capacity as the

_____

[6] *See* Tex. Health & Safety Code Ann. § 142.001(14), (15) (West Supp. 2016) (defining "hospice" to mean a person licensed under that chapter to provide services consistent with the chapter, including palliative care for terminally ill clients during the last stages of illness and during death).

medical director of a hospice. He has "experience caring for hundreds of nursing home patients in [his] career."

Ventimiglia's CV describes extensive experience training and supervising physician assistants, medical assistant staff, and nurses. It further shows that he has worked in hospice care since 2002.

Ventimiglia showed that he had sufficient familiarity with the issues involved in the claim against Azle Manor, and we hold that he was qualified to render an opinion on the standard of care applicable to Azle Manor and its staff and on proximate cause.[7] We overrule this part of Azle Manor's first issue.

*B. Sufficiency of the evidence as to proximate cause*

Under the next part of its first issue, Azle Manor challenges the sufficiency of the evidence as to proximate cause, both as to Davis's fall and to her death.[8]

---

[7] *See Foster v. Richardson*, 303 S.W.3d 833, 844 (Tex. App.—Fort Worth 2009, no pet.) (setting out the standard for determining whether a doctor is qualified to testify in a medical liability case and stating that the practitioner must have knowledge, skill, experience, training, or education regarding the specific issue before the court and that a practitioner generally is qualified "if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant").

[8] *See Darwin v. Fugit*, 914 S.W.2d 621, 626 (Tex. App.—Fort Worth 1995, writ denied) (defining proximate cause and stating that "[i]f an act sets in motion a natural and unbroken chain of events leading directly and proximately to a reasonably foreseeable result or injury, it is a proximate cause of that injury").

**1. Ventimiglia's proximate cause testimony**

*a. Tying of Ventimiglia's Opinion to Medical Facts*

Azle Manor first asserts that Ventimiglia's testimony about the cause of Davis's death was conclusory and did not tie his opinion to the medical facts.

Ventimiglia testified that Davis's fall proximately caused her death. But he did not merely opine that Davis's fall caused her death. He explained that the fall caused a brain hemorrhage, which caused bleeding in the brain, which caused brain swelling, which caused Davis to suffer a seizure, which caused an inability to swallow properly, which caused Davis to aspirate, which led to aspiration pneumonia, which led to her death.

Ventimiglia more specifically explained that "[a]spiration pneumonia is a condition where the lungs get filled with abnormal fluid and infection as a result of someone not being able to swallow properly. That aspiration is an abnormal swallowing. Instead of going into your tummy, it goes into the lungs." He explained what seizures are and how they are caused, and he stated that the abnormal movements present during seizures led to Davis's abnormal swallowing. And he also explained that what caused the seizures was intercranial hemorrhage, which is abnormal bleeding into the brain tissue. He further stated that the abnormal bleeding into the brain tissue came "as a direct

9

and sole result of the fall of [Davis] at Azle Manor." Ventimiglia's testimony was not conclusory in explaining how the fall caused Davis's death.[9]

We are similarly unpersuaded by Azle Manor's contention that Ventimiglia did not tie Davis's death to medical facts. Ventimiglia did not ignore Davis's medical records—for example, he referred to the EMT records in his testimony, and Davis's medical records indicated that she suffered from a hemorrhage after her fall, just as Ventimiglia testified. We overrule this part of Azle Manor's first issue.

*b. Other Plausible Causes of Injury*

Azle Manor next argues that Ventimiglia did not rule out other plausible causes of the injury that were raised by the evidence. Azle Manor references the testimony of Poston, the Azle Manor nurse practitioner who helped treat Davis at the facility. Specifically, Azle Manor points to her testimony that it was possible that Davis would die in the near future from underlying conditions she had before the fall. But in the testimony Azle Manor points out, Poston gave only a ten percent chance that Davis would die within the next six months from those underlying conditions—in other words, there was a ninety percent chance that Davis would not die from those conditions in the near future. Azle Manor points out other conditions that Davis had that were mentioned in her hospital records,

---

[9] *See Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) (stating that an expert's testimony must not be conclusory and therefore must "explain the basis of his statements to link his conclusions to the facts").

but it does not tell us how that evidence shows that those conditions were a plausible cause of Davis's death.

Other than Davis's health conditions existing before the fall, Azle Manor points to one incident in her medical records that it maintains could have been the cause of death and that Ventimiglia had to address: a notation that she vomited and then aspirated while hospitalized on September 14, 2010, which was four days after her fall. This evidence was presented to the jury through Poston's testimony. Poston testified the medical records showed that Davis vomited after receiving medication on September 14 and that "[t]his is *probably* where she aspirated." [Emphasis added.] Azle Manor argues that Ventimiglia was required to address the possibility that Davis died from aspirating vomit rather than aspirating because of seizures induced from the head trauma from the fall. Poston agreed that she did not examine Davis in the hospital before her death and that the doctor who completed the death certificate—a board-certified internal medicine doctor—did see Davis before her death while she was in the hospital.

"[A] medical causation expert need not 'disprov[e] or discredit[ ] every possible cause other than the one espoused by him.'"[10] But "if evidence presents 'other plausible causes of the injury or condition that could be negated, the

---

[10] *Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010) (alterations in original) (citation omitted).

11

[proponent of the testimony] must offer evidence excluding those causes with reasonable certainty.'"[11]

On its face, testimony that Davis vomited her medication appears to be consistent with, rather than contrary to, Ventimiglia's testimony that Davis's head trauma led to her having difficulty swallowing, which led to the aspiration pneumonia. But more importantly, Azle Manor does not explain how Poston, a nurse practitioner, was qualified to give an opinion on Davis's cause of death.[12] If Poston was not qualified to opine on Davis's cause of death, then Poston's evidence was no evidence of another plausible cause of death.[13] Accordingly, Ventimiglia was not required to negate it.

And even if Ventimiglia were required to negate Poston's suggested causes of death, given his testimony of proximate cause, he did so. He provided

---

[11]*Id.* (alteration in original).

[12]*See, e.g.*, Tex. Civ. Prac. & Rem. Code Ann. § 74.403 (West 2011) (stating that in a suit involving a health care liability claim, only a physician may qualify as an expert on proximate cause); *Talmore v. Baptist Hosps. of Se. Tex.*, No. 09-06-00024-CV, 2006 WL 2883124, at *4 (Tex. App.—Beaumont Oct. 12, 2006, no pet.) (mem. op.) (holding that a nurse practitioner was disqualified by statute as an expert witness on causation in that case).

[13]*See Anderson v. Gonzalez*, 315 S.W.3d 582, 585 (Tex. App.—Eastland 2010, no pet.) ("A person is qualified to give expert testimony concerning the causal relationship between the damages claimed and the alleged departure from the applicable standard of care only if the person is a physician and is otherwise qualified to render opinions on that causal relationship."); *Nexion Health at Southwood, Inc. v. Judalet*, No. 12-08-00464-CV, 2009 WL 3019717, at *4 (Tex. App.—Tyler Sept. 23, 2009, no pet.) (mem. op.) (holding that a nurse practitioner was not qualified to render an opinion on cause of death).

a causation opinion "that excluded, with reasonable medical certainty, [Poston's] suggested causes of death."[14]  Given that Ventimiglia's testimony was sufficiently reliable and that Azle Manor put on no evidence of a different plausible cause of death that needed be excluded, we overrule this part of Azle Manor's first issue.

### c. Proximate Cause of Fall

Azle Manor argues that the evidence was insufficient regarding the proximate cause of Davis's fall.  Specifically, it argues that Ventimiglia did not testify that in reasonable probability, the devices he recommended would have prevented Davis's fall.

The record shows, and Ventimiglia testified, that several of Davis's falls came from her leaning over and toppling out of her wheelchair and that "this is something that [Davis] d[id]."  He stated that given that Davis kept falling forward, putting her back in a wheelchair with nothing to help her balance made her falling again "almost a foregone conclusion."  And there was evidence that that was the cause of the fall in this case.  Ventimiglia testified that the devices he recommended prevent a patient such as Davis from toppling over.  That is, with one of these devices in place, a patient cannot simply topple forward out of the chair.  We further note that his supplemental expert report was admitted at trial.  In that report, he stated that if Azle Manor had not negligently failed to implement

---

[14]*Transcon.*, 330 S.W.3d at 218 (stating further that "[t]he evidence was not conclusive, but it was not required to be.  It was sufficiently reliable to be considered by the jury.").

such fall prevention interventions, in all reasonable medical probability, Davis would have been able to avoid her September 10, 2010 fall. The evidence was sufficient to show that, in reasonable probability, Davis would not have fallen if one of the devices had been used.[15]

Azle Manor then argues that a pamphlet put out by the Texas Department of Human Services,[16] which Ventimiglia referenced in support of his opinion, was also not evidence that the devices would have prevented Davis's fall because it states that falls will still occur when restraints are used. Azle Manor further argues that the pamphlet actually states that devices that function as restraints actually increase the likelihood of falls, and as the devices that Ventimiglia recommended—pommel cushion, wedge cushion, and geri-chair—function as restraints, the pamphlet is not evidence that using the devices prevents falls.

Ventimiglia discussed restraints, such as tying a resident to a wheelchair, and he described devices that, in his opinion, were not restraints. The devices

---

[15]*See Ponte v. Bustamante*, 490 S.W.3d 70, 75 (Tex. App.—Dallas 2015, pet. granted) (op. on reh'g) (stating that "reasonable probability" or "reasonable medical probability" of causation in a medical negligence case means "simply that it is more likely than not that the ultimate harm or condition resulted from the defendant's negligence") (quotation marks and citation omitted).

[16]The pamphlet was produced in cooperation with the Texas Medical Directors Association and the Texas Medical Foundation. In 2003, the legislature abolished the Texas Department of Human Services and divided its functions between the Texas Health and Human Services Commission and the newly-created DADS. Act of June 2, 2003, 78th Leg., R.S., ch. 198, §§ 1.01, 1.13A, 2003 Tex. Gen. Laws 611, 630.

he named were a pommel cushion, wheelchair wedge, or geri-chair, all of which he testified prevents someone from toppling or falling forward out of a chair.

The pamphlet discusses restraints, examples of which include "lap cushions or trays that a resident cannot easily remove" and devices used "in conjunction with a chair, such as . . . bars or belts that prevent a resident from rising." The pamphlet specifically lists "adaptive devices" "such as wedge cushions, recliners, [and] wheelchair modifications" as alternatives to restraints. These are not the types of devices that meet the definition of restraint used by Ventimiglia or by the pamphlet. From this evidence, the jury could have reasonably concluded that the devices recommended by Ventimiglia and the pamphlet were not restraints and would not have increased the likelihood of falls as restraints do.

Ventimiglia also testified that a gait belt should have been used in moving Davis, and evidence in the record indicates that this was not done and that it resulted in Davis's fall. The former director of nursing at Azle Manor acknowledged in her testimony that a gait belt is an assistive device and is not considered a restraint. Thus, Azle Manor's argument that use of a restraint does not prevent falls and would have increased the likelihood of a fall does not apply to the use of a gait belt.

Azle Manor then argues that Davis's underlying medical conditions could have caused her fall. This argument is not helpful to Azle Manor for several reasons. First, it does not address the admission by Azle Manor employees that

15

their actions precipitated Davis's fall. Second, even if the underlying health conditions did cause Davis's fall, Patterson's and Beavers's allegations in support of their negligence claim were that Davis was a known fall risk (whether from the underlying conditions Azle Manor relies on or some other condition), that Azle Manor did not take appropriate steps to prevent Davis from falling, that Davis fell, and that the fall set in motion a chain of events that led directly to her death. An argument that the fall was caused by Davis's underlying medical conditions does not negate these allegations. Poston acknowledged that Davis had had a high fall risk for years before her September 2010 fall.

The evidence at trial was some evidence, more than a scintilla, that Davis's death was caused by her fall and that Davis's fall would have been prevented by the use of assisted devices, and the jury's finding was not contrary to the overwhelming weight of all the evidence. We overrule this part of Azle Manor's first issue.

*d. Death Certificate and Ventimiglia's Testimony Versus Medical Records*

Next, Azle Manor contents that Ventimiglia's testimony and the death certificate were contrary to the actual medical facts. For this argument, Azle Manor points us to parts of Davis's medical records and argues that observations recorded in the records contradict both the death certificate and Ventimiglia's testimony.[17]

---

[17] *See Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) ("When an expert's opinion is based on assumed facts that vary materially from

16

But the records it relies on are not merely factual observations that would contradict or cast doubt on the death certificate or Ventimiglia's opinion.[18] They are observations of clinical signs. Azle Manor needed expert testimony to explain the significance of the observations and why they are inconsistent with Ventimiglia's cause of death opinion. Without such expert testimony, we cannot determine whether the observations contradict Ventimiglia's causation opinion.[19] Azle Manor directs us to no place in the record where a qualified expert witness provided an explanation of the significance of these observations with respect to the cause of Davis's death. Accordingly, we cannot say that on the basis of these records, both the death certificate and Ventimiglia's opinion of the cause of death were without probative value.

## 2. Probability of Davis's death prior to Azle Manor's negligence

Relying on case law that Texas does not allow recovery for "lost chance of survival" (discussed more in Azle Manor's third issue), Azle Manor further argues

---

the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment.").

[18]*Contra id.* at 498–99 (holding, in negligence case involving frostbite on plaintiff's foot after use of a medicated spray, that expert doctor's opinion was based on assumed facts that varied from actual facts when the doctor's opinion was based on a lack of redness on the foot after use of the spray, the doctor testified that if the foot was red, his diagnosis would have been different, and it was an undisputed fact that the plaintiff's foot became red after using the spray).

[19]*See Anderson v. Gonzalez*, 315 S.W.3d 582, 585 (Tex. App.—Eastland 2010, no pet.) (holding that only a physician otherwise qualified under the rules of evidence may testify about cause of death).

that Davis had only a ten percent chance of surviving for more than six months because of her underlying health conditions and that, accordingly, Azle Manor's negligence as a proximate cause was negated as a matter of law. Azle Manor relies on Poston's testimony for this argument. As we stated above and in our discussion of Azle Manor's third issue, however, what Poston actually testified was that Davis had a ten percent chance of dying in the next six months. Accordingly, we overrule this part of Azle Manor's first issue.

### 3. Sufficiency of Ventimiglia's and Frederick's opinions as to the standard of care and the breach of that standard

In addition to Ventimiglia's testimony, Patterson and Beavers put on testimony from Suzanne Frederick, a board-certified gerontological nurse. She teaches nursing students in a clinical setting, and she works for the federal government evaluating troubled nursing homes across the nation. Azle Manor contends that while both Ventimiglia and Frederick testified that Azle Manor should have updated its care plan for Davis in light of her fall risk, neither witness identified what changes should have been made in the plan or what Azle Manor should have done differently.

Azle Manor relies on *Palacios* for that proposition.[20] However, the part of *Palacios* that Azle Manor cited refers to the requirement to elucidate a standard of care—"Identifying the standard of care is critical: Whether a defendant

---

[20]*Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001).

18

breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.[21] Ventimiglia and Frederick both described the standard of care.

Ventimiglia testified that it was important for nurses to take care of the basic safety and needs of the patients. They are charged "with using their skills to assess the patient . . . and to assure the patient's safety." They further "have an obligation to communicate with the doctors who are taking care of the patients and other staff. They have an obligation to not just carry out the doctor's orders, but to make suggestions to the doctors based on what they are seeing." And he testified that based on what Azle Manor knew about Davis's falls, it needed to take steps to prevent those falls. In his opinion, Azle Manor should have used a different kind of wheelchair or made certain modifications to her wheelchair. As discussed above, he testified that such devices prevent a patient from toppling forward out of a chair.

Frederick testified that nurses are required to (1) "collect[] data . . . and do assessments appropriate for [the] patient," such as "a fall risk assessment"; (2) from the assessment, identify problems and risks; (3) put together a care plan to address the problems and risks; (4) implement and follow the care plan; and (5) evaluate if the plan is working. Nurses have an ongoing duty to reassess as incidents happen or circumstances change.

---

[21] *Id.*

Frederick noted that according to Azle Manor's care plan for Davis, in the summer of 2010, she was assessed with a higher fall risk. But there was no change to the plan in response to the new assessment until August 2010, and the plan that was put into place did not address the increased risk and was not appropriate for Davis. Given her fall risk, it was foreseeable that Davis would fall out of her chair again, and Azle Manor did not take appropriate steps to prevent that from happening. Frederick testified that a proper wheelchair with proper seating devices and proper pressure alarms to alert nurses when Davis was tipping forward would have prevented Davis's fall. She also testified that the devices listed in the pamphlet Ventimiglia testified about—the wedge cushions and so forth—were the types of seating devices and wheelchairs to which she referred. Azle Manor's records indicated that a pressure alarm was instituted, but it was unclear whether it went into Davis's wheelchair or her bed. No change was made to the type of wheelchair used with Davis, and no assistive devices were added to the chair.

Like Ventimiglia, Frederick testified that the nurses had an obligation to make suggestions to doctors about how to prevent a patient's falls, given what they knew. And she stated that it was not appropriate for Azle Manor staff to continue to put Davis in her wheelchair without modifications given what they knew about her. As far as using the gait belt, Frederick testified that Azle Manor nurse aides should have used a gait belt to transfer Davis, and a failure to use a

gait belt was a breach of the standard of care because it was a failure to follow the care plan.

Next, Azle Manor argues that Ventimiglia's testimony regarding use of a pommel cushion, wedge, and geri-chair were conclusory because he said that those devices were nonrestraining, but he did not explain how the devices were not restraints for Davis. We disagree. Ventimiglia discussed what restraints were and what the devices he recommended did, and he differentiated the recommended devices from the restraints that are dangerous for patients. Frederick testified similarly, differentiating the devices discussed in the pamphlet from the restraints that the pamphlet warned could cause more falls.

Azle Manor then asserts that the evidence was insufficient to show that it breached the standard of care by failing to provide a pommel cushion or reclining wheelchair. It states that Frederick testified that cushions and reclining wheelchairs require a physician's order, and Poston testified that physical therapy staff at Azle Manor did not recommend the devices and that physician's orders were not written for the devices because they were contraindicated for Davis. Thus, Azle Manor argues, it could not have provided those devices for Davis.

21

Ventimiglia testified that a pommel cushion does not require a doctor's order, and the jury was entitled to believe his testimony over Poston's.[22] Further, both Ventimiglia and Frederick testified that the nurses had an obligation to speak to treating physicians about fall prevention measures and that it was inappropriate to continue to put Davis in a wheelchair with no modifications and with no new plan for preventing her falls. Given that Davis continued to fall, even a layperson could see that whatever Azle Manor was doing, it was not working. And Frederick testified that what Azle Manor was doing to prevent Davis's falls was more or less nothing.

Further, the evidence shows that after Davis's September 10 fall and before her death, Azle Manor's minimum data set coordinator changed Davis's care plan to include the use of a pommel cushion with her wheelchair, and the nurse had requested authorization from Davis's doctor to do so. (A minimum data set is "a long and structured document used by the nursing staff to . . . do a complete assessment of the patient" and to put a summary of that assessment in numerical form "on a parameter-by-parameter basis.") This step is exactly what Ventimiglia and Frederick testified should have been done before Davis's September 10 fall. We overrule this part of Azle Manor's first issue.

---

[22]*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (stating that the jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony).

*C. Waiver as to the ambulance record and EMT testimony*

Finally under its first issue, Azle Manor challenges the admission of the ambulance record and testimony of emergency medical technicians (EMTs). Azle Manor argues that this evidence was inadmissible hearsay.

Specifically, Azle Manor challenges that part of the ambulance record in which the reporting EMT wrote what had been told to him by a member of the nursing staff. It also challenges the testimony of firefighter and paramedic James Bailey, who responded to the call about Davis; Bailey testified that the EMT's report accurately reflected what the paramedics were told by nursing staff on the day of Davis's fall. Bailey testified that the statements were memorable to him because it was "the first time in almost 24 years of being a paramedic, that [he] ha[d] ever had a nursing home tell [him] they had dropped a patient."

Patterson and Beavers point out that Azle Manor included this same evidence as part of one of its exhibits at trial. They argue that in so doing, Azle Manor waived any objection to this evidence. We agree.[23] Azle Manor sought and obtained admission of the report along with some of Davis's other medical records as part of one of its own exhibits. We overrule the remainder of Azle Manor's first issue.

---

[23] *See Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984) ("The general rule is that error in the admission of testimony is deemed harmless if the objecting party subsequently permits the same or similar evidence to be introduced without objection.").

## II. Exclusion of the DADS report

In its second issue, Azle Manor challenges the trial court's exclusion of the DADS report regarding Davis's September 10, 2010 fall.

A trial court's rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard.[24] An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis in the record for the ruling.[25] A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.[26] In a civil case, a document is admissible as a public record if "it sets out . . . the office's activities; . . . [or] factual findings from a legally authorized investigation; and . . . the opponent fails to demonstrate that the source of information or other circumstances indicate a lack of trustworthiness."[27]

Azle Manor argues that the DADS report was not inadmissible hearsay because the officials who wrote the report were not unknown, because it is a public record "setting out the office's activities and factual findings from a legally authorized investigation," because "much of the information contained in the

---

[24] *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

[25] *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

[26] *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

[27] Tex. R. Evid. 803.

Report are statements by Patterson, and statements by a party-opponent and admissible," and because Patterson and Beavers "failed to demonstrate that the source of the information or other circumstance indicated a lack of trustworthiness." Azle Manor contends that the exclusion of the report was harmful.

Azle Manor wanted the report admitted as evidence that a state agency had already found Patterson's complaints to be without merit. Aside from any objection to the statements by Patterson included within the report,[28] the report included conclusions by DADS, and those statements were not statements of a party-opponent. Accordingly, those statements do not fall within the exclusion from the definition of hearsay for statements by a party-opponent.

Further, the report does not meet the exception for public records because the report does not set out DADS's activities and factual findings from a legally authorized investigation and does not show trustworthiness. The report lists the complaints provided and, under each complaint, shows check boxes for someone to indicate whether the complaint has been substantiated, unsubstantiated, or withdrawn. For each complaint, the "unsubstantiated" box has been checked.

The report does not set out any factual findings at all. It does not explain what the investigator did to investigate the complaints or what "unsubstantiated"

_____

[28]See Tex. R. Evid. 801(e)(2) (stating that the statement of an opposing party is not hearsay when offered under the circumstances set out in the rule).

25

means in the context of an investigation. Nothing in the report indicates whether "unsubstantiated" means that the investigator determined that the complaints had no merit or simply that the investigator was unable to properly investigate the complaint at that time. Further, nothing in the report shows that the investigator was qualified to determine whether the complaints had merit. We agree with Patterson and Beavers that "[w]ithout any of the underlying facts upon which the investigator relied, or any description of the standards applied in reaching its decision, the DADS report is conclusory, unreliable and was properly excluded."[29]

The appendix to Azle Manor's brief includes pages of the report that were not offered in the trial and therefore not included in the appellate record, as well as a copy of a DADS pamphlet that likewise is not a part of the record.[30] Patterson and Beavers filed a document entitled, "Appellees' objections to Appellant's Evidence not in the record," objecting to Azle Manor's use of this evidence and requesting that this court disregard the evidence. We grant their objections, and we do not consider this evidence in our disposition of this appeal.

---

[29] *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 892 n.2 (Tex. App.—Texarkana 2004, pet. denied) (holding that the officer conducting the investigation "was not qualified, and his skill and experience were insufficient to give an opinion on whose negligence caused the accident," and that "[f]or that reason, his conclusions on the cause of the accident were also inadmissible as exceptions to the hearsay rule under Rule 803(8)").

[30] *See Green v. Kaposta*, 152 S.W.3d 839, 841 (Tex. App.—Dallas 2005, no pet.) (stating that appellate courts may not consider documents that are not part of the record).

We hold that the report was not admissible under the public records exception, and the trial court therefore did not abuse its discretion by excluding it as hearsay. We overrule Azle Manor's second issue.

### III. Denial of the lost chance of survival instruction

In Azle Manor's third issue, it asserts that it was entitled to a jury instruction on lost chance of survival. We disagree.

Azle Manor requested the following instruction: "You are instructed that Mary Davis must have had a greater than 50 percent chance of survival on the date of the alleged negligence for the negligence of Azle Manor, Inc., to be a proximate cause of injury to Mary Davis." Azle Manor argued that under *Columbia Rio Grande Healthcare*,[31] the instruction was required because the issue had been raised by the evidence. The trial court overruled the request. We review the trial court's ruling denying the requested instruction under an abuse of discretion standard of review.[32]

Azle Manor argues that "[r]ecovery in a medical negligence claim is barred where medical conditions pre-exist the alleged negligence of the health care provider, and at the time of such negligence, the plaintiff had a fifty percent or less chance of surviving or avoiding the harm from the underlying conditions." Azle Manor contends that "if the plaintiff's death, or condition at issue, was more

---

[31] *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 863 (Tex. 2009).

[32] *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (citation omitted).

likely than not to occur prior to or regardless of the defendant's negligence, then it cannot be proved in probability that the death or condition occurred because of the negligence," that the evidence showed that Davis had a ninety percent chance of death in the next six months and was more likely than not to fall due to underlying medical conditions, and that therefore "the evidence could not show that without Appellant's alleged negligence, Davis's death would not have occurred." Patterson and Beavers counter that a lost chance survival instruction does not apply to the allegations and circumstances in this case and that even if it did, the evidence at trial did not support the submission of the instruction.

A lost chance survival instruction is appropriate in cases in which the plaintiff has a condition that makes death more probable than not, and the defendant's medical negligence thus does not cause the plaintiff's death, but rather takes away the small chance the plaintiff had of surviving the condition.[33] Texas law requires "proof to a reasonable medical probability that the injuries complained of were proximately caused by the negligence of a defendant," and therefore liability in a medical negligence case requires proof that without the negligence, the harm complained of would not have occurred.[34] Some states provide a cause of action for lost chance of survival, which compensates a patient for the lost chance of recovering from an existing condition when that lost

---

[33] *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 399, 404–05 (Tex. 1993).

[34] *Hawley*, 284 S.W.3d at 860.

chance arises from medical negligence.[35]  In those states, even if the plaintiff's condition would have caused the patient's death in the absence of negligence, if the negligence took away whatever chance, however small, that the patient had of surviving the condition, the plaintiff may sue for the lost chance of survival.[36]

Texas has no such cause of action.[37]  Accordingly, in Texas, while liability for negligent medical treatment arises when a defendant proximately causes a plaintiff's death, there is no liability when the negligent medical treatment only decreases the patient's chance of avoiding a death that, even in the absence of the negligence, was more likely than not.[38]  When there is evidence at trial that shows that the plaintiff had a fifty percent or less chance of surviving, the defendant is entitled to an instruction in the charge that the jury may not find it proximately caused the plaintiff's injury unless the plaintiff had a greater than fifty percent chance of survival at the time of the negligence.[39]

Azle Manor's argument about Davis's likelihood of falling in the future merits little discussion.  A likelihood of falling is not a medical condition that leads

---

[35] *Kramer*, 858 S.W.2d at 400–02; *see also Duncan v. Carney*, 784 S.W.2d 488, 489 (Tex. App.—Houston [1st Dist.] 1990, writ denied) (defining the lost chance theory as one that "compensate[s] the patient for the deprivation of an opportunity to recover from disease or physical malady").

[36] *Kramer*, 858 S.W.2d at 400–02.

[37] *Id.* at 405.

[38] *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995).

[39] *Hawley*, 284 S.W.3d at 860.

inexorably to death. It is a condition that increases the likelihood of incurring another condition that can, in some instances, lead to death. A likelihood of falling, on its own, does not call for an instruction on lost chance of survival.

As for Davis's underlying medical conditions, Davis did not die because of negligence occurring in or related to the diagnosis or treatment of underlying medical conditions that probably would have resulted in her death regardless of the negligence related to the diagnosis or treatment. The negligence alleged was unrelated to either the diagnosis or treatment of her underlying medical conditions. Even were we to hold that a lost chance survival instruction applies to the negligence alleged in this case, we agree with Patterson and Beavers that the evidence does not support an instruction.

The evidence relied on by Azle Manor to support the instruction is the testimony of Poston, the nurse practitioner. Poston testified that she and the consulting doctor at Azle Manor had discussed Davis's health and had agreed that at the time of her fall, because of underlying medical conditions, Davis had a ten percent probability of dying in the next six months. A ten percent chance of dying is a ninety percent chance of surviving. This evidence does not support the submission of a lost chance survival instruction, and the trial court therefore did not abuse its discretion by not including it in the jury charge. We overrule Azle Manor's third issue.

## IV. Sufficiency of the evidence as to past medical expenses

In its final issue, Azle Manor argues that the evidence was legally and factually insufficient to support the jury's award of past medical expenses. It concedes that the evidence supports a finding that the amounts charged were reasonable and necessary. But it contends that the evidence does not establish a causal nexus between its negligence and Davis's past medical expenses and that it is therefore no evidence of causation for Davis's past medical expenses.

"[A] plaintiff should recover only for medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant, where such a differentiation is possible."[40] Azle Manor relies on *Guevara v. Ferrer*[41] to argue that the evidence in this case was insufficient to show that the charges incurred by Davis were proximately caused by its negligence. But *Guevara* is readily distinguishable. In *Guevara*, "'no medical records from [the patient's] hospitalization were introduced[,] . . . no medical testimony was introduced' at trial on the matter," and "no medical expert testified

---

[40]*Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 840 (Tex. 1997); *see also Christus Health v. Dorriety*, 345 S.W.3d 104, 108 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("A plaintiff may recover only for reasonable and necessary medical expenses specifically shown to result from treatment made necessary by the negligent acts or omissions of the defendant.").

[41]247 S.W.3d 662, 668–69 (Tex. 2007).

for [the patient]"; "only medical bills were introduced into evidence."[42] Here, Ventimiglia reviewed Davis's bills and medical records and testified about them. He testified that he had looked over the charges incurred and that none of them would have been necessary if not for the fall. Azle Manor did not cross-examine him on that point.

Ventimiglia's direct testimony established a causal link between the injuries Azle Manor caused and all subsequent medical care that Davis received.[43] And Ventimiglia did not equivocate in his statements that none of the charges incurred would have been necessary if not for the fall and that the fall was a direct result of Azle Manor's negligence.[44]

Next Azle Manor argues that Davis received care for preexisting conditions in the hospital, and Ventimiglia did not identify what care Davis had to receive as a result of her fall. Davis was taken to the hospital as a direct result of her fall, regardless of its cause, not because of any underlying conditions. And as we have said, Ventimiglia did not equivocate in testifying that Davis would not have

---

[42]*Haddard v. Rios*, No. 13-07-00648-CV, 2012 WL 1142779, at *4 (Tex. App.—Corpus Christi Apr. 5, 2012, pet. denied) (mem. op.) (discussing and distinguishing *Guevara*).

[43] *See Dorriety*, 345 S.W.3d at 110 (stating that the doctor's direct testimony established a causal link between the defendant's negligence and all subsequent medical care that the plaintiff received).

[44]*See id.* (noting that the doctor was unequivocal in his testimony that all the charges resulted from the defendant's negligence).

incurred any of the medical expenses were it not for the fall. Azle Manor does not tell us what charges it contends were not related to the fall.

Finally, Azle Manor argues that Ventimiglia was not qualified to establish the causal nexus between Azle Manor's negligence and Davis's past medical expenses for the same reasons it argues that he was not qualified to give an opinion on the proximate cause of Davis's death. For the same reason we rejected its previous argument about Ventimiglia's qualifications, we reject this argument. We overrule Azle Manor's fourth issue.

## Conclusion

Having overruled Azle Manor's four issues, we affirm the trial court's judgment.

/s/ Lee Ann Dauphinot
LEE ANN DAUPHINOT
JUSTICE

PANEL: DAUPHINOT, WALKER, and SUDDERTH, JJ.

DELIVERED: December 22, 2016